UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LEILA HARTLEY,                          )
                                        )
                Plaintiff,              )
                                        )
        v.                              )       No. 4:07 CV 1811 DDN
                                        )
                                        )
MICHAEL J. ASTRUE,                      )
Commissioner of Social Security,        )
                                        )
                Defendant.              )

## MEMORANDUM

This action is before the court for judicial review of the final
decision of the defendant Commissioner of Social Security denying the
application of plaintiff Leila Hartley for disability insurance benefits
and supplemental security income under Title II and Title XVI of the
Social Security Act (the Act), 42 U.S.C. §§ 401, et seq., and 1381, et
seq.  The parties have consented to the exercise of plenary authority
by the undersigned United States Magistrate Judge pursuant to 28 U.S.C.
§ 636(c).  (Doc. 7.)  For the reasons set forth below, the ALJ's
decision is affirmed.

## I.  BACKGROUND

Plaintiff Leila Hartley was born on March 4, 1947.  (Tr. 52.)  She
is 5'4" tall with a weight around 180 pounds.  (Tr. 85, 490.)  She is
married and has three adult children and one adult stepchild.  (Tr.
132.)  She completed high school.  (Tr. 92.)  She last worked as a mail
room specialist in 2005 for Centene Corporation.  (Tr. 102.)

On March 28, 2006, Hartley applied for disability insurance
benefits and supplemental security income, alleging she became disabled
on May 5, 2005, on account of knee problems, severe back pain,
arthritis, impairments of her right arm and leg, and depression.  (Tr.
47-55, 12, 19.)  She received a notice of disapproved claims on May 26,
2006.  (Tr. 19-23.)  After a hearing on May 9, 2007, the ALJ denied
benefits on June 15, 2007.  (Tr. 528-44, 9-17.)  On August 21, 2007, the

Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 4-6.)

## II. MEDICAL HISTORY

On January 21, 2004, Kenneth D. Smith, M.D., conducted an arterial pressure examination of Hartley's lower extremity. The testing showed no evidence of any significant narrowing of the lower extremity arterial tree. (Tr. 172.)

On September 3, 2004, Hartley underwent a screening colonoscopy. The colonoscopy came back normal. (Tr. 196-97.)

On October 25, 2004, a progress note indicated Hartley was suffering from bilateral leg pain, starting in the thigh and radiating into her lower back. It hurt to walk. Hartley said the problems had started over a year earlier, and the symptoms had gotten worse in the past few months. (Tr. 194.)

On November 10, 2004, a progress note indicated Hartley was suffering from bilateral leg pain and right hip pain, radiating into her back. The note indicated Hartley was taking Elavil, which gave her some drowsiness.[1] The note showed Hartley had joint pain and stiffness, but no swelling. An examination showed no edema in the lower extremities and no neurological deficits.[2] She was diagnosed with peripheral neuropathy and given a trial of Neurontin.[3] (Tr. 192-93.)

On May 5, 2005, Hartley tripped over a cord and fell directly on her left knee, while at work, fracturing her left patella.[4] At the time, Hartley was working in the mail room at Centene Corporation. She

---

[1]Elavil is used to treat depression. WebMD, http://www.webmd.com/drugs (last visited March 4, 2009).

[2]Edema is an accumulation of watery fluid in cells, tissues, or cavities. Stedman's Medical Dictionary, 489 (25th ed., Williams & Wilkins 1990).

[3]Neuropathy is any disorder affecting any segment of the nervous system. Stedman's Medical Dictionary, 1048. Neurontin is used to control seizures and to relieve nerve pain in adults. WebMD, http://www.webmd.com/drugs (last visited March 4, 2009).

[4]The patella is the kneecap. Stedman's Medical Dictionary, 1149.

described the job as moderately physical, with a great deal of standing, walking, pushing, pulling, and lifting. (Tr. 131-32, 486.) Later that day, Kenneth L. Miller, M.D., reviewed an x-ray of Hartley's left knee. He noted a fracture of the inferior corner of the patella and a moderate distraction of the fracture fragments. The remaining bony structures, alignment, joint spaces, and surrounding tissues were unremarkable. (Tr. 160, 208.) That same day, Dr. Smith reviewed an x-ray of the lumbosacral spine. The x-ray revealed osteopenia, increased lordosis, some disk narrowing at L1-2, but that the sacroilliac joints were unremarkable.[5] (Tr. 161.)

On May 6, 2005, Paul Maynard, M.D., examined her. He found her alert and oriented, with a few abrasions over the superficial aspect of the knee. Dr. Maynard diagnosed her with a displaced inferior pole patellar fracture and recommended surgery. (Tr. 142-43.)

On May 9, 2005, Dr. Miller reviewed an x-ray of Hartley's chest. The x-ray showed a minimal amount of atelectasis involving the right middle lobe.[6] Otherwise, her lungs were clear and her heart size was normal. (Tr. 210.)

On May 10, 2005, Dr. Maynard performed knee surgery to repair Hartley's patella fracture. The procedure involved excision of distal fragments, followed by advancement of the patella tendon. That same day, an x-ray revealed narrowing of the medial joint space in the knee. The x-ray did not reveal any discrete fracture. Following the surgery, Dr. Maynard planned for Hartley to be up and walking on the knee, as

---

[5]Osteopenia is a condition where bone density is lower than normal. Stedman's Medical Dictionary, 1110. Lordosis is an abnormal extension deformity - usually in the form of a backward curvature of the spine. Id., 894. The human spinal column consists of thirty-three vertebrae. There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx). The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back. The sacrum is immediately below the lumbar vertebrae. Id., 226, 831, 1376, 1549, 1710, Plate 2.

[6]Atelectasis is the absence of gas from the lungs due to failure of expansion or resorption of gas. Stedman's Medical Dictionary, 147.

tolerated. Following physical therapy, Hartley would be discharged. (Tr. 228-29, 232-33.)

On May 23, 2005, Hartley saw Dr. Maynard for an evaluation of her knee surgery. Dr. Maynard found her knee was stable and the incision was healing without difficulty, but there was some mild ecchymosis.[7] (Tr. 140.)

On June 30, 2005, Dr. Maynard excused Hartley from work pending further notice. (Tr. 180.)

On July 25, 2005, Kenneth M. Wilson, PT, a physical therapist at ProRehab, completed a daily note describing Hartley's progress. Hartley had no complaints of pain or difficulty during her session. She demonstrated full knee extension with 95 degrees of knee flexion. (Tr. 292.)

On August 12, 2005, Wilson noted Hartley's physical therapy progress. Hartley had attended eleven of her twelve sessions. Her knee flexion had improved, but she continued to report increased stiffness and soreness with prolonged sitting activities. She rated her pain at 5/10. Hartley was using one crutch to help her walk. Overall, Wilson noted Hartley had been compliant with visits and performed all activities without complaint. (Tr. 303.)

On August 15, 2005, Hartley saw Dr. Maynard for a follow-up after her knee surgery. Dr. Maynard had her continue with physical therapy, but cleared her to return to work. (Tr. 136.)

On August 25, 2005, Hartley returned to work. (Tr. 487.)

On September 7, 2005, Hartley saw Dr. Maynard for a follow-up after her knee surgery. Hartley noted good range of motion, but complained of strong pain. A physical examination showed very good range of motion, with profound tenderness along the joint line. The incision was well healed and she was neurovascularly intact. An x-ray revealed a

---

[7]Ecchymosis refers to a purplish patch caused by blood passing out of the blood vessels and into the skin. <u>Stedman's Medical Dictionary</u>, 484, 553.

"fairly normal appearing knee with some mild medial gonarthrosis."[8] Dr. Maynard diagnosed her with a probable medial meniscus tear in connection with her patellar fracture, and ordered an MRI.[9] (Tr. 134-35.)

On September 12, 2005, James A. Junker, M.D., reviewed an MRI of Hartley's left knee. The MRI revealed some fluid escaping from the small joint, but that the patella was well seated in the intercondylar groove, the medial and lateral ligaments were intact, and that there was no evidence of a cyst on the back of the knee. There was no fluid collection in the tendons, the cruciate ligaments were unremarkable, and there was no evidence of any defects in the bone or cartilage. There was some marrow edema and foreshortening of the lateral meniscus, which suggested the possibility of a tear in the meniscus. Dr. Junker thought Hartley might be suffering from chronic tendinitis. (Tr. 224-25.)

On September 29, 2005, Hartley stopped working. (Tr. 487.)

On September 30, 2005, Hartley underwent knee surgery to repair a left medial meniscus tear. After the surgery, Dr. Maynard diagnosed Hartley with left knee plica and left knee femoral lesion.[10] (Tr. 223.)

On October 7, 2005, an exam showed no evidence of deep vein thrombosis.[11] (Tr. 222.)

On October 18, 2005, Brandi Vitale, MPT, a physical therapist at ProRehab, discussed Hartley's progress at ProRehab. Since beginning therapy, Hartley noted a significant decrease in pain and soreness in her knee, and increased mobility. However, she still experienced severe

---

[8]Gonarthrosis is chronic wear of the cartilage in the knee joint. See Stedman's Medical Dictionary, 136, 663.

[9]The meniscus is a fibrocartilaginous structure of the knee. Stedman's Medical Dictionary, 944.

[10]Plica syndrome occurs when plicae (bands of remnant synovial tissue) are irritated by overuse or injury. Plica syndrome produces pain and swelling, and locking and weakness of the knee. National Institute of Arthritis and Musculoskeletal and Skin Diseases, http://www.niams.nih.gov/Health_Info/Knee_Problems/default.asp (last visited March 5, 2009).

[11]Thrombosis is clotting within a blood vessel which may cause a loss of blood to the tissues supplied by the vessel. Stedman's Medical Dictionary, 779, 1597.

pain, 9/10, after periods of prolonged weight bearing. Hartley was able
to walk without an assistive device, but did have an antalgic gait and
moderate edema at the left knee.[12] Her three incision sites were healing
well. Overall, Hartley remained cooperative and compliant while in the
clinic. She showed progress in increased range of motion and improved
strength. (Tr. 321.)

On October 31, 2005, Vitale cancelled a therapy session with
Hartley, after Hartley was very upset about her husband's poor health.
(Tr. 367.)

On November 2, 2005, Hartley saw Laura Shackelford, APNC, and Dr.
Anthony Anderson at the Pain Management Center, complaining of left knee
pain. Hartley described the pain as throbbing, which became worse with
walking, standing, and sitting. Physical therapy provided only short-
term relief. Her two past surgeries also provided only minimal relief.
A physical examination showed Hartley walked with a limp, but required
no assistive device. There was no neurological focal deficit found, and
she had full sensation over the patella. Muscle strength was minimally
diminished in the left lower extremity. She could flex her knee with
moderate discomfort, and there was no laxity of the knee joint. Hartley
was diagnosed with a history of left patellar fracture, degenerative
joint disease of the left knee, and insomnia. Dr. Anderson prescribed
her a trial of Neurontin and suggested a selective nerve root block to
help with her pain symptoms. (Tr. 131-33.)

On November 4, 2005, Vitale outlined Hartley's progress. Hartley
had attended eleven of thirteen physical therapy classes since beginning
on October 10, 2005. Hartley continued to complain of significant pain,
soreness, and swelling in her knee, but reported being able to move
around with greater ease. Hartley rated her knee pain as 5/10, but 9/10
after prolonged weight bearing. Vitale observed that Hartley had an
antalgic gait, but was able to walk without an assistive device.
Hartley was able to perform general range of motion, strengthening, and
flexibility activities. Vitale remarked that Hartley had remained
cooperative and compliant with her therapy, demonstrating general

---

[12]An antalgic gait refers to a posture or gait assumed in order to
avoid or lessen pain. See Stedman's Medical Dictionary, 65, 91.

motivation and a desire to achieve her goals and return to function. Hartley had made slow but steady progress with endurance, improved her knee range, and increased her strength. She continued to have limitations with knee flexion and range of motion, though she was tolerating the exercise progression well, without any complaints of pain or adverse side effects. (Tr. 251-58.)

On November 16, 2005, Lisa Martin, MS, a therapist at ProRehab, completed a work conditioning entrance evaluation. Hartley had significant decreased range of motion and strength in her left knee. She also had significant difficulty squatting with her left knee, and was completely unable to kneel with her left knee. Martin believed Hartley's efforts were valid, and that her subjective reports were consistent with her behavior and function. At the same time, Martin thought Hartley's ability to kneel and squat were self-limited, to some extent, by her reports of pain. In her impression, Hartley's postural and positional tolerances were the factors limiting her ability to return to work, but she believed Hartley could safely perform within the medium work demand level. Martin saw no evidence of symptom magnification, and noted the consistency and quality of Hartley's efforts had been good. A chart from Martin's assessment indicated that Hartley was able to occasionally sit, stand, walk, bend, reach, and squat. She was able to heal walk and toe walk, though with a mild antalgic pattern. (Tr. 259-63, 406-17.)

On November 30, 2005, a progress note indicated Hartley had clear lungs, did not have a fever, and that her abdomen was soft and benign. She was diagnosed with acute sinusitis. (Tr. 186.)

On December 7, 2005, Martin completed a work conditioning exit evaluation. She noted that Hartley had a high level of self-perceived disability. Since her initial evaluation, Hartley had significantly increased the range of motion in her left knee, but that it was still limited compared to the range of motion in her right knee. There was no change in her left knee strength. She continued to have difficulty squatting and kneeling with her left knee, though her gait had improved. A summary chart indicated Hartley could frequently stand, walk, and reach, and could occasionally climb stairs, bend, and squat. Her

ability to sit and reach overhead was unrestricted. Martin found Hartley's efforts valid, and that her subjective complaints were consistent with her behavior and function. She did however continue to display some self-limiting behavior due to reports of pain, and was "frequently absent from therapy due to report[s] of illness and high pain levels. . . ." Martin noted that the main factors limiting her return to work included postural and positional tolerances for bending. Overall, Martin believed Hartley had the ability to safely perform within the medium work demand level. (Tr. 264-279, 379-99.)

On January 23, 2006, Hartley saw Craig E. Aubuchon, M.D., for an independent medical evaluation of her left knee. Hartley had been complaining of constant pain. At the time, she was taking Hydrocodone and Premarin.[13] A physical examination showed Hartley had full extension in both knees, but had somewhat reduced flexion in the left knee. She had a healed surgical incision around the left knee, and the area was extremely tender to palpation all around the area. She was negative for Tinel's sign and there was no redness.[14] Reviewing past x-rays, he found no evidence of any meniscal injuries, and believed the anterior and posterior cruciate ligaments were both intact. He did not think Hartley had any sympathetic dystrophy, chondromalacia, or many degenerative changes.[15] He attributed Hartley's knee pain to her fall at work. On the whole, Dr. Aubuchon believed Hartley was capable of working, but thought she should limit herself to standing for only two hours at a time, and avoid kneeling and squatting. He thought some amount of

_____

[13]Hydrocodone is a narcotic pain reliever, used for short periods of time, to treat moderate to severe pain. Premarin is an estrogen replacement for menopausal women. WebMD, http://www.webmd.com/drugs (last visited March 4, 2009).

[14]Tinel's sign is a sensation of tingling, or of "pins and needles," felt in the distal extremity of a limb, when percussion is made over the site of an injured nerve. Stedman's Medical Dictionary, 1422.

[15]Sympathetic dystrophy is an uncommon nerve disorder, which causes intense pain, usually in the arms, hands, legs or feet. Medline Plus, http://www.nlm.nih.gov/medlineplus/complexregionalpainsyndrome.html (last visited March 4, 2009). Chondromalacia is the softening of any cartilage. Stedman's Medical Dictionary, 298.

bending, grasping, and overhead lifting were reasonable.  Dr. Aubuchon believed Hartley's scar tissue was inhibiting her movement and contributing to her pain, and suggested excising the tissue.  While guarded in his outlook, he did not think Hartley had reached her maximum medical improvement.  (Tr. 144-49.)

On February 28, 2006, Dr. Maynard excused Hartley from work for two days due to left knee pain.  (Tr. 176.)

On March 9, 2006, Hartley underwent knee surgery to try and correct her ongoing left knee pain.  As part of the surgery, Dr. Maynard excised the foreign bodies and removed the sutures, and partially excised the patella fat pad.  The surgery revealed no visible abnormalities.  The plan was for Hartley to be up and weight bearing, as tolerated, on her left leg.  (Tr. 218-20.)

On March 22, 2006, Hartley indicated she was depressed and under stress on a medical screening form.  (Tr. 361.)

On March 23, 2006, Wilson completed a progress report for Hartley.  She continued to have knee pain, which increased with standing, walking, and bending.  The pain was located over the anterior aspect of the knee, but radiated into the calf, thigh, and hip.  Her scar was healing and she had no drainage or wound gaping at the time.  She was to continue working with ProRehab for help with her range of motion and strength.  (Tr. 346.)

On March 28, 2006, B. Demel, a social security examiner, conducted a face-to-face interview with Hartley.  During the course of the half-hour interview, Demel noted that Hartley had to stand several times for a few minutes because of her knee problems.  Demel observed that Hartley walked with a limp.  (Tr. 71-73.)

On March 29, 2006, Hartley completed a knee outcome survey.  She indicated that pain, stiffness, swelling, slipping, buckling, and weakness had a moderate affect on her activities.  Grinding and grating severely affected her activities.  Her knee prevented her from walking more than one block, standing for longer than a half-hour, and sitting with her knee bent for longer than a half-hour.  Her knee prevented her from kneeling, squatting, and walking without a limp.  She had to

descend stairs with the help of a railing, and could rise from a chair only by using her hands and arms to assist. (Tr. 355-56.)

On March 31, 2006, Kenneth Wilson completed an evaluation of Hartley's progress. Her left knee continued to give her constant discomfort, and weight bearing activities only aggravated the pain. She described no significant change with respect to her subjective complaints. Wilson noted some improvement in range of motion, and that Hartley had been compliant with her visits and performed all the activities without complaint. (Tr. 287.)

On March 31, 2006, Hartley was fired from her job due to her extended absence. (Tr. 486.)

On April 4, 2006, Hartley continued to report pain in her left knee. (Tr. 344.)

On April 13, 2006, Hartley completed a function report. In a typical day, Hartley got up, showered, and went to therapy. If she was not in pain, she might do some housework. Her illness made it difficult to get comfortable and fall asleep, but she did not have any problems with personal care. She was able to prepare complete meals on a daily basis. She performed light cleaning and did laundry, for about two hours, three times a week. She could drive a car by herself and go grocery shopping, which she usually did once a week, for two hours. She enjoyed reading, watching television, and sewing, but her knee pain limited her ability to sit at her sewing machine for too long. She also attended church regularly, and did not need anyone to accompany her. She did not have any problems getting along with others, following instructions, or completing tasks. She could walk one block before needing two or three minutes of rest. She could handle changes in a routine, but did not handle stress well. (Tr. 94-101.)

On April 13, 2006, Hartley completed a work history report. From 1983 to 2000, she worked as a grocery clerk and in the office of a grocery store. From 2001 to 2005, she worked as a mail room specialist for an insurance company. As part of the grocery job, Hartley stood seven hours a day, lifted up to twenty pounds, and wrote, typed, or handled small objects. As part of the mail room job, Hartley sat eight

hours a day, lifted up to twenty pounds, and wrote, typed, or handled small objects. (Tr. 102-09.)

On May 24, 2006, P. Moran, a Social Security Administration consultant, completed a psychiatric review technique. Moran checked the box indicating Hartley had no medically determinable impairment. In the notes section, P. Moran mentioned that there was no mention of psychiatric issues or depression in Hartley's medical record. (Tr. 460-72.)

On May 25, 2006, Barbara Huffman, a Social Security Administration medical consultant, completed a physical residual functional capacity assessment. In her opinion, Hartley could occasionally lift twenty pounds, frequently lift ten pounds, stand / walk for at least two hours in an eight-hour day, and sit for about six hours in an eight-hour day. Huffman did not believe Hartley had any manipulative, visual, or environmental limitations, but noted she could only occasionally climb or kneel. (Tr. 473-78.)

Sometime after June 2006, Hartley completed a disability report appeal. Since the time of her last disability report, she noted feeling more depressed and more nervous. (Tr. 113-17.)

On November 20, 2006, David Volarich, D.O., performed an independent medical evaluation. In his report, Dr. Volarich noted that he was not one of Hartley's treating physicians. Hartley told Dr. Volarich that after her injury, she could not perform the lifting necessary for her job (lifting the thirty- to forty-pound mail bags) and could not stand for prolonged periods of time. She also complained of a shooting pain and numbness in the area of her left knee. Her left foot cramped and she had difficulty stooping, squatting, crawling, and kneeling. When she climbed stairs, she had to lead with her right leg and pull her left leg up behind her. She could only stand and walk comfortably for about thirty minutes. She was able to care for herself and could drive. However, running the vacuum caused her knees to ache and she could no longer play with her grandchildren because of the pain. Two to three times a night her knee pain disturbed her sleep, though this was less frequently than before. (Tr. 485-88.)

Dr. Volarich noted Hartley's other complaints. She had problems with her right hand, but these problems had not caused her to miss work. She complained of back problems in 1999, 2000, and again in 2004. Hartley noted that the injury in May 2005 had aggravated these problems. Still, she stated she could bend, twist, push, and pull, but avoided impact activities. She stated she could lift twenty-five to thirty pounds without difficulty, and stand and walk without difficulty. She did not recall missing any additional days of work because of her back problems. (Tr. 488-90.)

A physical examination showed Hartley was well developed and well nourished. Her heart, lungs, neck, and thorax were normal. A mental screening exam was normal. Hartley walked with a limp, but had no ataxia.[16] She could not toe walk or heel walk because of the knee pain, but could tandem walk and stand on each foot without much difficultly. She could only squat about one-third as far as normal. During a musculoskeletal exam, Hartley experienced lower back pain with extension. Palpation elicited pain in the left sacroiliac joint and left sciatic notch.[17] An examination of Hartley's knees showed that her left knee flexion was 120 degrees, while her right knee flexion was 140 degrees (140 degrees is normal). Reviewing these findings and past medical reports and x-rays, Dr. Volarich concluded that the May 2005 accident was the primary factor for Hartley's patella fracture and subsequent corrective surgeries. Dr. Volarich believed that Hartley had achieved maximum medical improvement. He believed she was able to perform most activities for self-care, and thought she might be able to perform some work activities, provided she avoided certain movements and weights. In particular, Dr. Volarich advised Hartley to avoid all stooping, squatting, crawling, kneeling, pivoting, climbing, and any impact maneuvers. He also found she needed to limit prolonged weight

---

[16]Ataxia is an inability to coordinate the muscles in the execution of voluntary movement. Stedman's Medical Dictionary, 147.

[17]The sciatic notch is one of either of two notches on the dorsal border of the hip bone. Miriam-Webster's Online Dictionary, http://www.merriam-webster.com/medical/sciatic%20notch (last visited March 4, 2009).

bearing to twenty to thirty minutes, including standing or walking, and avoid lifting more than twenty pounds. (Tr. 490-98.)

On May 23, 2007, Timothy G. Lalk, a vocational rehabilitation counselor, prepared a vocational rehabilitation evaluation for Hartley. Hartley described her primary problem as trying to walk, explaining that her ankle becomes stiff and causes her to almost fall. She also continued to have pain in her left knee several times a day, with the pain lasting anywhere from a few minutes to over an hour. She described pain in her left hip and lower back. Hartley admitted to symptoms of depression, which coincided with the deterioration of her husband's health, starting in 1982. Her depression grew worse over time and consisted mostly of crying, feeling down, and feeling apathetic. Some days she did not feel like leaving her house. She did not have any problems with confusion or memory loss. (Tr. 499-506.)

Hartley told Lalk that she was able to lift about fifteen to twenty pounds, and could stand for about twenty minutes in a spot without moving. When she was able to move around, she believed she could be on her feet for a couple of hours at a time. She could walk for about fifteen or twenty minutes before her knee started to lock up. She had problems with balance and stability, but could bend at the waist without difficulty. She could sit for thirty minutes before experiencing pain in her left hip and lower back. She took Ibuprofen and would stand to avoid these problems. Hartley's husband was disabled and she had to help bathe and feed him, though hospice workers were able to provide home care. Hartley thought she would be in too much pain to work a normal eight-hour day; at home, she was able to alternate between sitting, standing, and walking. Based on his review of the medical records and Hartley's own statements, Lalk concluded that Hartley was not able to secure and maintain employment because of her limited physical capabilities and mood disorder. (Tr. 506-12.)

**Testimony at the Hearing**

On May 9, 2007, Hartley testified before the ALJ. She last worked for five years as a mailroom specialist. As part of the job, she helped open and sort insurance forms. Before that, she worked in the service

center of a grocery store, cashing checks and money orders.  She also worked as a cashier at the grocery store for about fifteen years.  (Tr. 528-33.)

After her injury in May 2005, Hartley underwent three surgeries. The first surgery was on May 10, 2005, and the second surgery was on September 30, 2005.  The third surgery, in March 2006, was simply to retrieve a stitch and clean things up.  Dr. Maynard performed the surgeries, and he released Hartley afterwards.  As part of his release, Dr. Maynard restricted Hartley to very light work with no squatting or bending.  (Tr. 533-35.)

Hartley's left leg stiffened and her ankle sometimes locked when she walked, causing her to trip.  She had pain in her right arm, running from the wrist to the elbow, up into her shoulder and back.  She had headaches and hip problems as well.  Hartley did not have insurance or money to see anyone for her arm or hip problems.  She left Centene Corporation on a medical leave of absence, but was later terminated because she had not worked in six months.  Hartley did not think she could return to that job because she could only sit for thirty to forty-five minutes before her back hurt and she needed to lay down.  (Tr. 535-37.)

At home, Hartley cared for her husband, who was in hospice care. She helped him get dressed and cooked for him, though bending over and standing at the kitchen caused her pain.  She could only stand at the stove for about fifteen or twenty minutes before she needed to sit down. Hartley and her husband received Meals on Wheels because she did very little grocery shopping.  She could only walk for about a block on a level surface before stiffening up and needing to relax.  She usually laid down anywhere from thirty to ninety minutes a day.  (Tr. 537-40.)

During the hearing, Dr. John Gunfield testified as a vocational expert (VE).  The ALJ had the VE assume that Hartley could occasionally lift and carry up to twenty pounds, frequently lift and carry up to ten pounds, use a stand-sit option to work, and occasionally climb stairs, stoop, crawl, kneel, and crouch.  Under these circumstances, the VE testified that Hartley could return to past work at either the grocery store or the mail room.  In the grocery store, Hartley did no lifting,

and in most grocery store customer service jobs, the individual was given a stool and could alternate between a standing and sitting position. Most mail room jobs also had a stand/sit option, and were classified as light work by the <u>Dictionary of Occupational Titles</u>. The ALJ also had the VE assume that Hartley could only occasionally lift and carry ten pounds, could only stand or walk for two hours in an eight-hour day, and needed to sit for six hours. Under these circumstances, the VE did not believe Hartley could perform her past work. (Tr. 540-44.)

### III. DECISION OF THE ALJ

The ALJ noted that Hartley alleged disability based on an impaired left knee, severe back pain, arthritis, an impaired arm and right leg, and depression. The ALJ found that Hartley suffered from degenerative joint disease of the left knee and a history of internal derangement of the left knee, and that these conditions were severe. On the other hand, the ALJ dismissed her complaints of depression and right leg impairments because no objective medical evidence corroborated these allegations. The ALJ found Hartley's complaints about right arm problems not severe. In 1994, Hartley underwent a carpal tunnel release, but was able to work, from 1995 to 2005, in jobs requiring that she manipulate objects. She also did not mention her arm problems in her application. Given her work history, the ALJ gave virtually no weight to Dr. Volarich's opinions about her right hand. The ALJ found the medical record did not show Hartley had an inability to walk effectively for at least twelve continuous months. (Tr. 12-14.)

The ALJ considered Hartley's testimony about her stiffness and pain, and her inability to sit, stand, or walk for extended periods. The ALJ acknowledged Hartley's history of left knee problems. She had undergone several surgeries on her knee, and Dr. Maynard had restricted her work from mid-2005 to February 2006. Yet, the ALJ did not find these impairments disabling. Dr. Maynard released Hartley to work in March 2006, clearing her to perform light work so long as it did not require bending or squatting. Notes from her physical therapist indicated Hartley had an antalgic gait and lacked hip control, but had

full extension and nearly full flexion with her left knee, significant left lower extremity strength, and minimal to moderate atrophy in her left quadriceps. Dr. Volarich's report showed similar flexibility and strength in the left knee. His report also showed that Hartley's left knee condition had aggravated her lumbar condition. An x-ray from 2005 showed a mild degree of degenerative disk disease. At the same time, Dr. Volarich found Hartley had nearly full range of motion in her spine. The ALJ gave some weight to Dr. Volarich's findings, but did not entirely adopt them because he found them inconsistent with the record as a whole. (Tr. 14-15.)

The ALJ found Hartley not entirely credible. Hartley told Dr. Volarich that she could care for herself and her disabled husband. At the hearing, Hartley testified that she does not shop, yet in April 2006, she reported that she shops once a week, for two hours at a time. The ALJ found that shopping for two hours was inconsistent with an inability to stand for more than fifteen or twenty minutes at a time. After April 2006, there was no evidence Hartley had visited any doctors or used any pain medication. The ALJ noted that Hartley did not have insurance, but added that Dr. Maynard had released her from his care, and that there was no evidence Hartley ever sought charitable, financial, or medical assistance. Hartley told Dr. Volarich she could walk for thirty minutes, but testified she could only walk a block at a time. Hartley did not walk with an assistive device and no doctor had ever recommended that she lay down or recline during the day. Taken together, the ALJ concluded that Hartley had the residual functional capacity (RFC) to lift or carry twenty pounds occasionally, ten pounds frequently, sit and stand throughout the workday with a sit/stand option, and occasionally stoop, kneel, crouch, crawl, and climb stairs. Looking to the VE's testimony, the ALJ concluded that Hartley could perform her past relevant work, and was therefore not disabled within the meaning of the Social Security Act. (Tr. 15-17.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings are supported by

substantial evidence in the record as a whole.  Pelkey v. Barnhart, 433
F.3d 575, 577 (8th Cir. 2006).  "Substantial evidence is relevant
evidence that a reasonable mind would accept as adequate to support the
Commissioner's conclusion."  Id.  In determining whether the evidence
is substantial, the court considers evidence that detracts from, as well
as supports, the Commissioner's decision.  See Prosch v. Apfel, 201 F.3d
1010, 1012 (8th Cir. 2000).  As long as substantial evidence supports
the decision, the court may not reverse it merely because substantial
evidence exists in the record that would support a contrary outcome or
because the court would have decided the case differently.  See
Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

    To be entitled to disability benefits, a claimant must prove she
is unable to perform any substantial gainful activity due to a medically
determinable physical or mental impairment that would either result in
death or which has lasted or could be expected to last for at least 12
months.  See 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A).  A
five-step regulatory framework governs the evaluation of disability in
general.  See 20 C.F.R. §§ 404.1520, 416.920; see also Bowen v. Yuckert,
482 U.S. 137, 140-42 (1987) (describing the five-step process); Fastner
v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003).  If the Commissioner
finds that a claimant is disabled or not disabled at any step, a
decision is made and the next step is not reached. 20 C.F.R.
§§ 404.1520(a)(4); 416.920(a)(4).

    In this case, the Commissioner determined that Hartley was able to
perform her past work.

### V.  DISCUSSION

    Hartley argues the ALJ's decision is not supported by substantial
evidence.  First, Hartley argues that the ALJ failed to properly
consider her RFC.  Second, Hartley argues the ALJ failed to properly
consider her subjective complaints.  Third, she argues that the ALJ's
hypothetical question to the VE did not adequately capture the concrete
consequences of her impairments.  Fourth, she argues the ALJ failed to
consider the vocational evidence from Timothy Lalk.  (Doc. 16.)

**Residual Functional Capacity**

Hartley argues the ALJ failed to properly consider her RFC.  In particular, she argues that there is no evidence in the record she was capable of bending or stooping, abilities which nearly any job requires.

The RFC is a function-by-function assessment of an individual's ability to do work-related activities based on all the evidence.  Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007).  The ALJ retains the responsibility of determining a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians, examining physicians, and others, as well as the claimant's own descriptions of her limitations.  Pearsall v. Massanari, 274 F.3d 1211, 1217-18 (8th Cir. 2001).  Before determining a claimant's RFC, the ALJ must evaluate the claimant's credibility.  Id.  Ultimately, the RFC is a medical question, which must be supported by medical evidence contained in the record.  Casey, 503 F.3d at 697; Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

In this case, the ALJ found Hartley's allegations not credible, and concluded Hartley retained the mental and physical ability to perform her past work.  In particular, the ALJ concluded Hartley retained the RFC to lift or carry up to twenty pounds occasionally, ten pounds frequently, sit and stand throughout the workday with a sit/stand option, and occasionally stoop, kneel, crouch, crawl, and climb stairs.  Substantial medical evidence supports these findings.

In October 2004, while still working, Hartley complained of bilateral leg pain and pain while walking.  In November 2004, she continued to complain of leg, hip, and back pain, but continued to work.  In May 2005, after her accident at work, an x-ray revealed a fractured kneecap, but otherwise, showed the remaining bony structures, alignment, joint spaces, and surrounding tissues were unremarkable.  Later that month, Dr. Maynard found the knee was stable and the incision healing without difficulty.

In August 2005, Dr. Maynard, Hartley's treating physician, cleared her to return to work.  (Tr. 136.)  On August 25, Hartley returned to work.  In September 2005, Dr. Maynard found Hartley had good range of motion, her incision was healing well, and she was neurovascularly

intact. An x-ray and MRI revealed a fairly normal looking knee. On September 29, 2005, Hartley stopped working.

In November 2005, Hartley continued to complain of significant pain, but she did not require an assistive device for walking. Reports from the Pain Management Center showed there were neurological deficits, muscle strength was only minimally diminished, she could flex her knee, and there was no laxity in the knee joint. A report from ProRehab indicated Hartley was able to occasionally sit, stand, walk, bend, reach, and squat, and that she could safely perform within the medium work demand level. In December 2005, a report from ProRehab noted that Hartley could frequently stand, walk, and reach, and could occasionally climb stairs, bend, and squat. The report also indicated Hartley had increased the range of motion in her left knee.

In January 2006, Dr. Aubuchon found Hartley had full extension in her left knee, with no evidence of any dystrophy or tears in the meniscus. He believed Hartley was capable of working, with some bending allowed, but should stand only two hours a day. In March 2006, Dr. Maynard found no visible abnormalities during a surgery. After this surgery, Hartley testified that Dr. Maynard cleared her to perform light work with no squatting or bending. In April 2006, Hartley indicated she could prepare meals on a daily basis, clean and do laundry, drive a car, and grocery shop for about two hours. In November 2006, Hartley told Dr. Volarich she could lift twenty-five pounds, stand, and walk without difficulty. She also noted she could bend, twist, push, and pull. She could squat, but only one-third as far as would be normal. Her left knee flexion was to 120 degrees, or 20 degrees shy of normal. Dr. Volarich believed she could perform some work activities. In May 2007, Hartley told Timothy Lalk she was able to lift about twenty pounds, could stand for twenty minutes in one spot, and could probably be on her feet for a couple of hours at a time if she was able to move around.

In her disability application, Hartley complained of knee problems, back pain, arthritis, right arm and leg problems, and depression. Yet, there is no evidence in the medical record that Hartley ever sought treatment for her back pain, arthritis, right arm and leg problems, or her depression. For several months, Hartley received treatment and

rehabilitation for her knee problems, but there is simply no record of any other forms of medical treatment. There is no evidence Hartley was taking any medication to combat symptoms or issues related to these problems, and she was never hospitalized for any symptoms relating to these issues. See Craig v. Chater, 943 F.Supp. 1184, 1189 (W.D. Mo. 1996) ("Allegations of a disabling impairment may be properly discounted because of inconsistencies such as minimal or conservative medical treatment."). Looking to the record, substantial medical evidence supports the ALJ's determination that Hartley's back pain, arthritis, right arm and leg problems, and depression were not disabling.

Substantial evidence also supports the ALJ's determination that Hartley's left knee problems were not disabling. Despite her surgeries, Dr. Maynard cleared Hartley to work two different times. He also found no evidence of any abnormalities. Dr. Aubuchon found no evidence of any dystrophy or tears, and also believed Hartley was capable of working. X-rays and MRIs revealed a fairly normal looking knee. See Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995) (the lack of objective findings to support pain is strong evidence of the absence of a severe impairment). She told Dr. Volarich she could stand and walk without difficulty. Reports from ProRehab showed Hartley was improving, and had good range of motion. Other reports showed she could occasionally climb stairs, bend, and squat. Dr. Volarich also found she could squat to a limited degree. At different times, Hartley herself explained she could bend, twist, lift twenty pounds, drive, prepare meals, attend church, shop for a couple of hours, and be on her feet for a couple of hours at a time if allowed to move around. See Forte v. Barnhart, 377 F.3d 892, 896 (8th Cir. 2004) (shopping for groceries, running errands, cooking, driving, exercising, attending church, and visiting relatives did not support claimant's alleged inability to work).

After reviewing the record, substantial medical evidence supports the ALJ's RFC determination.

**Subjective Complaints**

Hartley argues the ALJ failed to properly consider her subjective complaints.

The ALJ must consider a claimant's subjective complaints. _Casey_, 503 F.3d at 695 (citing _Polaski v. Heckler_, 739 F.2d 1320, 1322 (8th Cir. 1984)).  In evaluating subjective complaints, the ALJ must consider the objective medical evidence, as well as the so-called _Polaski_ factors.  _Guilliams v. Barnhart_, 393 F.3d 798, 802 (8th Cir. 2005).  These factors include: 1) the claimant's prior work history; 2) the claimant's daily activities; 3) the duration, frequency, and intensity of the claimant's pain; 4) precipitating and aggravating factors; 5) dosage, effectiveness, and side effects of medication; and 6) functional restrictions.  _Id._; _O'Donnell v. Barnhart_, 318 F.3d 811, 816 (8th Cir. 2003).  While these factors must be taken into account, the ALJ does not need to recite and discuss each of the _Polaski_ factors in making a credibility determination.  _Casey_, 503 F.3d at 695.

The ALJ may discount subjective complaints of pain, when the complaints are inconsistent with the evidence as a whole.  _Id._  However, the ALJ _may not_ discount a claimant's allegations of disabling pain simply because the objective medical evidence does not fully support those claims.  _O'Donnell_, 318 F.3d at 816.  When rejecting a claimant's complaints of pain, the ALJ must "detail the reasons for discrediting the testimony and set forth the inconsistencies found."  _Guilliams_, 393 F.3d at 802.  If the ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, the reviewing court "will normally defer to the ALJ's credibility determination."  _Casey_, 503 F.3d at 696.

The ALJ set out the _Polaski_ factors in his decision, and addressed several of the factors in discounting Hartley's subjective complaints. The ALJ discussed Hartley's condition, but noted several inconsistencies in her statements over time concerning her daily activities.  The ALJ also discussed Hartley's treatment and pain regimen.  After April 2006, the ALJ found no evidence that Hartley had visited the doctor or used any pain medication.  Finally, the ALJ noted Hartley's functional restrictions, and mentioned some of her daily activities.  Under the circumstances, the ALJ followed the _Polaski_ factors, and gave a good reason for discrediting Hartley's subjective complaints.

**Hypothetical Question**

Hartley argues that the ALJ's hypothetical question to the VE did not adequately portray the consequences of her impairments.

The Commissioner can rely on the testimony of a VE to satisfy his burden of showing that the claimant can perform other work.  Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008).  For the VE's testimony to rise to substantial evidence, the ALJ's hypothetical question must be correctly phrased and must capture the concrete consequences of the claimant's deficiencies.  Id.  The ALJ's hypothetical question does not have to include all of the claimant's alleged impairments; it need include "only those impairments that the ALJ finds are substantially supported by the record as a whole." Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006).

During the hearing, the ALJ's hypothetical question had the VE assume that Hartley could occasionally lift and carry up to twenty pounds, frequently lift and carry up to ten pounds, use a stand-sit option to work, and occasionally climb stairs, stoop, crawl, kneel, and crouch.  This hypothetical corresponded to the ALJ's ultimate RFC determination.  Looking to Lacroix and Robson, the hypothetical question to the VE was correctly phrased and captured the consequences of Hartley's impairments.

**Report from Timothy Lalk**

Hartley argues the ALJ failed to consider the vocational evidence from Timothy Lalk.

Lalk prepared his vocational evidence report on May 23, 2007 – two weeks after the hearing, but a few weeks before the ALJ reached his decision.  The ALJ did not mention Lalk's report in his opinion.  This omission does not necessarily amount to reversible error.  See Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000); Swarnes v. Astrue, Civ. No. 08-5025-KES, 2009 WL 454930, at *10 (D.S.D. Feb. 23, 2009).  While the ALJ has a duty to develop the record fully and fairly, "an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." Craig, 212 F.3d at 436.

Lalk's report adds very little to the medical record. Lalk did run any physical or mental tests. He did not conduct any physical or mental examinations. Instead, Lalk administered two tests designed to measure Hartley's educational abilities - not any of her physical, job-related abilities. Lalk's report is largely devoted to providing summaries of medical records and Hartley's statements and background - much of which is already found in the record. Taken together, there is little support for Lalk's ultimate conclusion that Hartley would be unable to "secure and maintain employment in the open labor market . . . because of her limited physical capabilities and her mood disorder. . . ." (Tr. 511); see Swarnes, 2009 WL 454930, at *11 ("It is appropriate to give little weight to statements of opinion by a treating physician that consist of nothing more than vague, conclusory statements."). The ALJ's failure to discuss Lalk's report was therefore harmless error. See id. at *10 ("While a lay witness's testimony or statements should generally not be ignored without comments, an ALJ's failure to explain his rejection of such testimony constitutes harmless error when that testimony does little more than corroborate other testimony and adds nothing of substance to the record.").

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.

_____/S/____David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on March 9, 2009.